The United States Cargo Fields with Federal Circuit is now open and in session. Good morning. Please be seated. Okay. We have three cases this morning, two for oral argument. Before we begin hearing oral argument, we have a motion pending here from Judge Hughes. Could the applicant for the bar please rise? I have an admission this morning. I'm very happy to move the admission of my law clerk, Kristen Cobb, who's been with me over two years. I think my longest serving clerk. I'm sorry to see her leave, but I know that she is excited to move on and progress in her legal career, and I wish her well. So I move the admission of Kristen Cobb, who is a member of the bar and is in good standing with the highest courts of Virginia and the District of Columbia. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. Okay, thank you. We will now confer. Very good. I also know about Ms. Cobb's credentials, and I'm very confident she's going to be an excellent member of our bar, and I wish Judge Hughes the best. Without Ms. Cobb, he's going to need it. The motion is granted. All right. We'll now hear the first argument of the morning. Eli Lillian Company versus Corrigo Company. Appeal number 16-2554. Mr. Lipsy, whenever you're ready. Thank you, Your Honor. May it please the court, I'd like to focus my argument this morning on the obviousness issue in the 944 Axilla patent. We are content, barring something very unusual, to rely on our briefs on the other issues that are in the case. We contend that the judgment of obviousness in the 944 patent has to be reversed for at least two reasons. The first is a clearly erroneous factual error in concluding that the Cutter 2001 reference determined that DHT levels were normal following application of testosterone to the adult male Axilla at A80 and other places. The publication is unambiguous in the protocol, indicating that the DHT data was gathered by administering testosterone to the inside of the upper arm or the chest below the Axilla, neither of which is the Axilla itself. If we conclude that we don't have a clear and definite conviction that the judge below misread the Cutter references and in fact we defer to her finding that the Cutter references do in fact teach applying testosterone to the Axilla, then in fact it does teach with a reasonable expectation of success of applying testosterone to the Axilla with normal DHT levels. Is that right? If the court so concluded, the court would be, with respect, clearly erring in the same way that the district judge did for this reason. Okay, but if we disagree with you on that, then Cutter does teach and suggest the notion of applying testosterone to the Axilla with a reasonable expectation of success of getting a good testosterone level with a normal DHT level. Am I being fair and accurate in that assessment, assuming my premise that the Cutter references can fairly be read as applying testosterone to the Axilla? That critical piece of evidence is integrally tied to Cutter's statement of his protocol where he gathered that evidence in 10 patients and he said explicitly where it was applied, inner arm, chest below the Axilla. And neither of those is the Axilla. Okay. That's where the data came from. Right, that's your view of where the data came from, I understand that. But now can you explain to me where in the literature that you mentioned is there a report that the Axilla and scrotal skin have in fact shared the same comparably high 5-alpha reductase activity? The Takayasu publication, which we've cited in our brief. Right, but Takayasu doesn't report any 5-alpha reductase activity for the scrotal skin area, does it? It has a statement in the text that it is high in genital areas and in the Axilla, citing references in the literature. That was the state of the art at the time. The perception in the field was it was high in both places because both places have these apocrine sweat glands, which is the organ or structure that comes into being at puberty in the secondary sex characteristic areas, and which is responsible for producing this enzyme. And it is for that reason that there was and should have been legitimate concern that you would have the same problem if you applied directly in the Axilla as you did with the scrotal. And nobody had done that experiment, Your Honor. It had been known since 1967 that the Axilla, which was studied by Feldman as a special kind of skin, not the chest, not the arm, the Axilla, was more permeable than the arm. And it had been known since 1983 that there were topical formulations of testosterone, and nobody, nobody ever attempted to put testosterone directly in the Axilla until E. Crux did it in 2005, and there's a good reason for that. Well, what about Cutter? Cutter 2000, Cutter 2001, Ashkenazi. They all teach, I mean, the words say what they say.  These are not anticipations. None of them is an anticipation. That's because of the formulation of testosterone. I understand that. The only evidence in this record, and indeed the only evidence I'm aware of, of a formulation that actually satisfactorily works in this regard, is that formulation, which is E. Crux's product, and which a who's who of the generic drug industry is here wanting to copy for application in the Axilla. And that being the case, the question is, even reading that, would a person skilled in the art be dissuaded from going there? People skilled in the art were dissuaded from going to the Axilla for anything. There was no commercial product from 1967 to 2005, no commercial product, not just testosterone, for anything. And why? The Axilla, the adult male Axilla, was a cesspool of sweat, hair, bacteria, antiperspirants, deodorants, and 5-alpha-betaine. You don't need to be quite so nasty. What about Ashkenazi? What do we get from Ashkenazi? Good question. One of the errors here, we contend, is that the trial court found this preliminary notion of a prima facie case and then evaluated all the rebuttal evidence for its knockdown. And I think we pointed out in our response to the letter on supplemental authority, you know, the cyclopenzaprine case, and even going back to where this issue first came up in the CCPA, the Henry Reinhart case we cite there, which is binding on this court. The danger there is that your judgment on these things is shaped by this preliminary conclusion. And Reinhart says there's only one way out, and that is you have to retrace the path to decision, retrace the whole path to decision with all the evidence. And indeed, in a federal district court, that's the only issue. Before we get to that, could you respond to Judge Plager's actual question about Ashkenazi? Yes. One of the errors, that was a long way of getting exactly there. I knew you'd get there. One of the errors is the court's thinking that Cutter had resolved this issue caused her to greatly overread Ashkenazi. Ashkenazi is a garden variety formulation patent. It's got myriad possibilities, all of which have one unifying concept, using urea. And he describes using all kinds of hormones for all kinds of conditions. Including testosterone. Including, but all kinds. Patients, male and female, and all kinds of surfaces. As long as it's included, what else you get is immaterial. Not true. That patent cannot be read as saying that every drug can be applied to every patient for every condition on every surface. That's just not the way these things are written. And nobody thinks that's what it means. It is required to have an element of common sense in realizing, for example, to use the trivial example, you're obviously not going to apply testosterone for a female patient. But the danger, the health danger, in the prostate only arises with a special drug, testosterone, in a special class of patient. Adult males, not juvenile males, as we saw in Ben Galen. And application only to a special surface. One high in 5 alpha reductase. And Ashkenazi does not specifically suggest applying testosterone to the axilla of an adult male patient. I'm not contending it's not broadly encompassed. But the disclosure is a blender bus. And the trial judge pointed to a series of claims, thinking that they taught that. They don't. If you look at those, there are two kinds of claims. There are claims that mention the seven surfaces, not even preferential honor. Exemplary. And those, all of those depend from claims that have the whole laundry list of drugs. You're not suggesting, though, that in order for the trial judge to find obviousness, the prior art needs to be specific about the exact invention, are you? I am suggesting that there is nothing in Ashkenazi, since he doesn't apply testosterone to the axilla of any male patient. Nor does any of the other prior art in an amount sufficient for systemic absorption. He doesn't apply it, and there's nothing in there that would ameliorate the concern about applying testosterone to a 5 alpha reductase-rich tissue like the axilla. Because, for example, the judge said, well, you do it to differentiate your product, or you do it to avoid transference. But the need to avoid transference was in the literature since 1986. We pointed that out in our papers. And their Dystar case, they cite, says the desire to reap commercial benefit from improving a product is universal, even commonsensical. And therefore, Your Honor, age old. But nobody did it. And nobody did it even when the problem arose with scrotal testosterone. So going back to Cutter, if we agree with the lower court's finding that Cutter, 2000-2001, teach the notion of applying testosterone to the axilla, and you end up getting, according to Cutter, no elevated DHT level, then where does that leave us? It leaves you in error, with respect. Okay. Okay. I get it. I understand. And again, what I want to... Going back to Takayasu, all the measurements for the axilla, those were with females, right? None of them were with males. I don't recall. The glands... Okay, I'll recall for you. It's with females. Well, that's fine. That's exactly the problem. So that's very peculiar, isn't it? No, not at all. Because you can determine whether there's a DHT risk, whether it goes up by doing a test in females. There's just no health issue with females, because the health issue is the prostate issue, which only applies to the men. That's kind of exactly the point, is that there may... You might read Ashkenazi to say, well, some of these might be applied to some patients in the axilla, I think. You might read it that way, but there's no specific suggestion or there's no specific disclosure of doing testosterone in the adult male axilla. And why is that important? And I hate to keep harping on this. What stopped everybody we contend is the recognition that that tissue, when you're talking about the real axilla, not some little hairless periphery around the edge, which Dr. Hadgraf said was small and wasn't enough to apply the drug to, and is not what Cutter was describing. If you're applying it to the axilla, there is a very substantial risk that you're going to have exactly the same problem you had with the scrotum. And nobody, in the absence of something that answered that concern, the trial judge even found it was a concern, get her exact language, a particular concern, the potential for increased risk. Mr. Lipsey, you're into your rebuttal. Do you want to save it? Your Honor, from the questioning, I think I'd better use it up. Well, I'll save it. Thank you. Okay. We have a brief. Yes, thank you. Okay. Mr. Nutter, is that right? That's correct. Okay. May it please the court. I'll follow counsel's lead and start with the factual issue about lack of motivation. The lower court found unpersuasive Lilly's evidence that a person of skill in the art would be discouraged from applying testosterone to the axilla because of the concerns of DHT. Now, that's not surprising because the court found at least six prior references that specifically expressly taught application of testosterone to the axilla for specific purposes. Why is it that the district court considered Lilly's teaching away argument in the context of secondary considerations rather than in what I understand to be the more customary way, which is in the motivation to combine analysis? Well, I would submit that the court considered it in both contexts. It was proffered at trial as a teaching away secondary consideration. But the court, in its opinion, prior to conducting any legal analysis, had at least 50 pages of detailed factual findings. It collectively considered all the evidence of all four Graham factors. It collectively considered them. I think it's appended to page 40 to 93. It considered all the evidence collectively before it conducted any of its obviousness analysis. Therefore, by definition, it took in consideration the teaching away references before concluding anything about motivation or secondary considerations. Now, I'd like to specifically address Cutter. Now, the courts held that Cutter 2000 and 2001 expressly taught application of testosterone to the axilla. The line that counsel points to in Cutter that defines the axilla as near the chest, that was expressly asked to our expert at trial what was meant by that. And he replied that that includes the axilla. And the court found that credible. Near the axilla includes the axilla? The chest near the axilla includes the axilla. That's how the expert replied. And that's exactly, the court found that credible. But she found it credible for multiple reasons because she looked at Cutter 2000 and 2001 and exactly what they said. Now, Cutter 2000, this is appendix 22155, the third column under application site, says the choice of the application site is quite important. When the gel is applied to the trunk or axillary area, the resulting balance of testosterone, DHT, and E2 will be very much in the normal physiologic range. Cutter understood that the application site was very important. He was going to be careful to define it, exactly how it needed to be defined. And Cutter 2001 specifically includes the data that he relied upon to reach those conclusions. And there's table 2, this is appendix 22161, where he identified the 10 patients that he applied the testosterone to. And he identified how much was applied and the exact location of where it was applied. And for patients 5, 6, and 7, he identified the location as the axilla. Now, Lilly's expert testified that he was using axilla as a shorthand to mean something other than the axilla. The court did not find that credible. In fact, the court said that that made no sense because it does not make sense. Cutter was teaching application of testosterone to the axilla. And he was also teaching that application of testosterone to the axilla resulted in normal DHT levels. Now, moving from Cutter is Ashkenazi. Ashkenazi absolutely teaches application of testosterone. Can you talk a little bit about Takayasu? Sure. Your opposing counsel talks about how, okay, maybe Takayasu didn't actually do any studies on the scrotal skin to compare against the results for the axilla gland. But opposing counsel mentions that Takayasu itself somewhere in the narrative talks about how both the axilla and the scrotum have high 5-alpha reductase activity. Takayasu is at best neutral on the issue of increased DHT. All Takayasu did was take biopsy samples of small portions of a female cadaver skin. Could you address the specific question I have, which is the point that was raised by your opposing counsel? Sure. So Takayasu concludes. In his conclusion, he states, you cannot take my findings and apply them to scrotum skin. He doesn't say specifically to scrotum skin, but what he says is, however, this is appendix 22798, second column, under discussion. However, in addition to complexity of the skin's constituents, different experimental conditions used in these studies, which may possibly have affected the in vitro testosterone metabolism, does not permit us to draw a parallel between various components of the skin from different regions or those in a diseased state in terms of 5-alpha reductase activity. He's saying that whatever his findings were, you can't draw a parallelism between his axilla findings and those of the scrotum skin. That's what Lilly was asking the court to do. The court rejected that notion, relying on Takayasu's own words to do that. OK. Mr. Nutter, I think we have your argument. We need to move on to one of your other co-counsel. Thank you. Which one is this? Thank you, Your Honor. William Mercosi on behalf of Perigo. Mercosi, OK. On behalf of who? Perigo. Perigo, OK. A couple of quick points on 103 and some of Your Honor's questions. Number one, my co-counsel wasn't able to get to it. Ashnikazi clearly taught treatment of hypogonadal men with testosterone. Their expert, Dr. Hadgraf, admitted that. Number two, to Takayasu. Before you even get to the Takayasu issue, Lilly's whole theory is based on the fact that scrotal application is like axilla application and that there were actually DHT concerns with scrotal application. But with Cutter, Cutter has a couple of important points in there, even beyond teaching to the axilla. Cutter reports that even with scrotal application, there were no DHT concerns. That with the testoderm scrotal patch clinical trials, there were no prostate issues over placebo. In fact, if you go back to all of the Lilly literature that they cite, back to the 1980s, even before the scrotal patch was approved, that literature recommends the scrotal patch is safe and effective. FDA then approved it as safe and effective. And all the literature after that recommends it as safe and effective and identifies no DHT or prostate issues or concerns. And that's Lilly's own cited literature, like McClure, like Finley, doesn't identify any issues with scrotal application. And as the district court found, if there's no issues with scrotal application, then clearly that's not going to teach away from the axilla, even if the tissue was comparable. And we submit the district court's findings on Takayasu were correct. They could not have been error because the tissue is not comparable. Takayasu was not comparing scrotal versus axilla tissue. He was studying a isolated sweat gland, not the entire whole intact axilla. Can you remind me, did Takayasu say anything about the axilla and the scrotal skin sharing some properties? He cited two different studies saying, generally speaking, that they're both considered to have high 5-alpha activity. But then he issued his cautionary statement that you should not compare these components of skin from different regional or anatomic regions of the body. And so the only testimony in this record from Dr. Potts and as found by the district court, is that Takayasu was not directing or not designed to study scrotal versus axilla skin. But again, before we even get to that alleged connection, there were no concerns over the scrotal application. Their own patent, the 944, teaches scrotal application. Ashkenazi teaches scrotal application. Every piece of art here continues to mention scrotal application as safe and effective for increasing testosterone. So there were no safety issues. Are you saying there's no literature talking about the concerns of elevated DHT levels? It mentions elevated DHT and it says the clinical significance at best is unknown. Lilly's own counsel said that in opening statements, that clinical significance is unknown. I think he used the words, there's evidence both ways on that. There's a debate. At best, that's what it shows. But Cutter, even if you don't read Cutter for the axilla, Cutter reports after applying it to the scrotum, that there's no safety issues regarding scrotal application. So we think both of their assumptions fall here. Their assumption that somehow DHT was a concern of the scrotum, which it wasn't, because every reference was teaching to use it in the scrotum. And number two, they didn't establish any comparison between the axilla and scrotal skin. But there clearly was a concern with DHT, wasn't there? There was the issue or signal in the art, Your Honor, of elevated DHT levels, and questions asked, does this have clinical significance? And as the expert of the defendants, Dr. Snyder, testified, it did not have clinical significance. And we can look at Cutter for that, again, and we can look at Lilly's own literature, which I believe McClure said less credence is given to that theory. Cutter said, again, no prostate issues using the scrotal patch over placebo, and that there's no practical support for that theory. That's what Dr. Cutter reported, even beyond his axilla findings. Lastly, Your Honor, I want to put in one point on Section 102. I want to point to a statement Lilly's counsel just said here. We believe the claim is not just obvious, it's also anticipated, because a skilled person would understand the skin to be a teaching and a disclosure of the axilla as well. Counsel himself just said, for Lilly, that the axilla was known since 1967 to be a special area of skin. What's the significance of it being held anticipated as against it being held obvious? Well, if it's obvious, invalid is invalid. But our point is that it would be anticipated. I thought that was the law, that it could only be invalid once. Correct. Why do you make a point of the anticipation issue? We just want to make the point, Your Honor, that the judgment could be sustained on either ground, anticipation or obviousness, based on the Morgan 725 publication. Okay, we have your argument. Thank you. Thank you, Your Honor. Let's hear from the last of your side. Good morning, Your Honors. It may please the Court, John Battaglia on behalf of Anne Neal, the cross appellant. And on the issue of the simple 861 applicator patent, the District Court, by contrast, relied on a series of fundamental legal and clearly erroneous findings of fact, including express violations of KSR and this Court's Amgen precedents. But most fundamentally and most simply, the Court erred, both legally and factually, in finding that there was no double wall structure disclosed by the Garay 187 reference. And this is the simplest way to resolve this issue, this side of the case. If Your Honors would turn to page 6 of the reply brief, or otherwise page 34, it all boils down to whether the only limitation that was disputed for Garay 187 and whether there are two walls, a double wall structure shown. Are we talking about walls 201 and 204? 201 and 204, exactly. I didn't see your side raising this particular theory below. It was raised. The only theory I saw below, supported by Dr. Singh, was the theory of removing the annular rib 204 and then just relying exclusively on peripheral wall 201. That was an alternative theory. Okay. What was an alternative to? For the sake of argument, assume right now that I only saw one theory presented below and also assume that your now exclusive theory that you're raising to me, I believe is a brand new theory that wasn't raised below anywhere. Where would I find it? It would be in a few different spaces. Most importantly, A129 of the district court's express findings adopted verbatim from Lilly's proposed findings at A7071 of the record and also from Lilly at A31027. So it wasn't like there were any. I'm sorry. Where did you raise it? Our expert addressed it in testimony in the context of addressing lots of different limitations, identified those. Right, and where did he raise it? I'm sorry. It's 1579, 1582, 2194 and 95, and 2071 and 72. Okay, so if I don't find it there, then I have to conclude that this was waived. It's not, Your Honor, because this court's precedents hold, such as in O2 micro, that if the court reaches the issue, there is no waiver. That's this case, at minimum, because on A129, the district court expressly addressed this very issue, and tellingly, it didn't find that there was no double wall because the structures weren't tall enough, as their expert testified and argued at 1582, addressing this very issue, and described it expressly as an alternate anticipation theory. The district court instead erroneously adopted the legal requirement that those double walls had to fold over to form a double wall. That doesn't make any sense. It was legally erroneous because there already is a double wall structure. There's already a double wall structure right there. What the court got confused about was the other single wall theory and how on their infringement theory, and conversely, the anticipation theory. Your current theory, was it anywhere in your proposed findings of fact or post-trial findings of fact, conclusions of law? It was reflected in the proposed findings of fact. Okay, you're telling me it's in there. It's in there in the sense it's described. That figure is described as being strikingly similar to the applicator disclosed in the 861. Where in those briefings did you point to annular rib 204 as being part of the double wall structure? For the findings, I'll point the court to 6857, and also the demonstrative exhibit that was presented as part of Dr. Singh's trial presentation as well that's on our reply brief at page 6, where they're identifying those walls as being the double wall structure. Identifying both walls? I only saw it highlighting wall 204 and not highlighting wall 201. No, I think it was referring to both, but the fact that the district court itself expressly addressed this issue, Your Honor, disposes of any kind of waiver argument. That's consistent with this court's precedent and indeed Rule 52A5 itself. You're into your time now. We'll save you your minute for rebuttal. Thank you, Your Honor. Let's restore three minutes for Mr. Lipsy. Thank you, Your Honor. Could you answer the question on the 861 patent? Amnil is suggesting that the district court actually reached and passed on the question of whether the annular rib 204 can be part of the double wall limitation, and so therefore that issue, even though maybe they didn't clearly advance it, nevertheless was preserved for appeal. What do you think about that? I don't recall the trial court passing on that. My perception is that the argument is a wholly new argument. It is not the argument they advanced at trial. If I may, Your Honor. Were you there for the trial? I wasn't, although my colleague, Mr. Burwell, carried the water on that patent. Just to answer a couple of questions. On Takeyatsu, which is plaintiff's trial exhibit 583, it's misnumbered in the appendix. I think it's 582. Where is it in the appendix? It starts at page 22797, and there are two important parts of it. The part that I had been citing is on 22798 in the right-hand column, and it says, Our knowledge of the localization of 5-alpha reductase activity in the skin largely depends on indirect evidence obtainable from a study with whole skin. The activity is high in genital and axillary skin. And then Takeyatsu added that because he found the source of it is in the apricot sweat glands, and the Flynn publication, which is at A22275, points out that apricot sweat glands are exceptionally localized in the genital area, in the axilla, and around the nipples. And those two together are what create the perception in the field that there is a high risk, not only in the sclerosis, but also in the axilla. Moreover, the Cutter 2001 publication, talking about the testoderm data, was in 2001. There are similar publications in 2001. Those statements were greatly undercut by the withdrawal of that product in 2002, in part because of the 5, of the DHT issue. And indeed, the replacement product, which the trial court actually mentions on a footnote, testoderm 2-TTS, is shown in the FDA filings, Plaintiff's Trial Exhibit 92 and 93, was specifically designed to be placed elsewhere to avoid the high 5-alpha reductase. And indeed, in the actual field of treating testosterone deficiency, the scrotum was not a favored place. It was off limits after 2002. You can see the products that were there all went somewhere else. Arms, shoulder, stomach, and it's more than that. If you look at the package inserts for androderm, androgel, and testum that are in the record back in the prescribing information, they're not agnostic about it. They say never apply it to the genitals. Final point? Final point, Your Honor, is that the trial court specifically found that the clinical significance of elevated DHT levels was uncertain in June of 2005. That's at A-172. And an unassertainable health risk in this business would normally say you should not do it. And she made exactly the opposite conclusion and said, because it's uncertain, they wouldn't have been dissuaded. And that is clearly wrong, and it highlights the prejudgment of the objective indications based on the problem. Thank you very much. You've been very patient. Thank you. Case is submitted. Oh, the case is not submitted yet. We have one more minute. Make good use of it. So the core principle, of course, on a belt review is God may know, but the record must show. And on A-129 and the other sites I just provided the court, that shows that this issue was preserved and will not expressly. And the errors that I want to emphasize are not only the error with respect to the foldover, where no foldovers were required by this, but also the express errors in finding that the device here would be rendered inoperable for its intended purpose of absorbing cosmetics. That's directly contrary to GRADE 187 itself, which time and again discloses that it can be elastomeric, elastically deformable. That point's not in dispute. And also discloses it can be applied to the skin. It's not limited to absorbing cosmetics. And when they point, for example, to testimony saying that Dr. Singh, the defendant's expert, made an admission about inoperability, that didn't have anything to do with this GRADE reference. It was referring to figures one, two, and three, a different structure. And so those are two core legal errors. Hypothetical question here. If we defer to all the fact findings the judge made with respect to the 861, then we affirm the finding of non-infringement. Or finding of infringement, sorry. And we also affirm the finding that you failed to prove that the patent is invalid. Then you still have the view that the case needs to go back to address some other invalidity challenges? Correct. There are two issues in particular. The obviousness issue in further view of the DiPietro reference, which taught in addition using applicators to apply testosterone to a sensitive part of the skin, like the axilla. Right. But I guess what I'm wondering is why wouldn't it be utterly futile to send that question back if we've already concluded that neither GRADE 187 nor GRADE 986 nor a combination of those two references teaches the double wall limitation? Then what's the point of sending back the question of whether DiPietro in fact teaches applying testosterone to the axilla with an applicator? That doesn't seem to have any utility to do that. Well, if you're addressing the district court's analysis, that turned on motivation and combine. And the motivation and combine in turn is buttressed further by the DiPietro reference. But if we conclude that DiPietro was only relied on below by co-counsel for teaching the idea of using an applicator to the axilla, then that has no relevance at all to modifying either of the GRADE references for purposes of the double wall limitation. Well, you're right. Stepping back, I think there would have to be a determination made by the district court in the first reference on the motivation and combine issue. And the other issue is with respect to 112.1 in the written description. And I will emphasize, if I could, that. Which was based on a contingency, as I understand it from the briefing, that the court accepted a certain understanding of the claim to cover a single wall being folded over to be a double wall, which the court ultimately rejected. Okay, that's the important point. And if you look at the court's decision at A181 and, again, I think it's at 193, it didn't, as a matter of law, reject the notion that the 861 wall here could be met by a single wall applicator. It found, as a matter of the burden of proof, as a matter of fact, that plaintiffs hadn't shown that they met their burden of proof in showing that the accused walls could do it. So that's still a wide-open issue about the claims here being able to cover that. And because of that, that is still a viable defense for him being the only one found to infringe on this. Okay, very good. Thank you very much. Thank you, Your Honor. The case is now submitted.